J-S27030-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| ZARYAB IQBAL | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| CHRISTOPHER J. ZORN | : | No. 481 MDA 2023 |

Appeal from the Order Entered March 22, 2023
In the Court of Common Pleas of Centre County Civil Division at No(s):
16-0074

BEFORE:  BENDER, P.J.E., BOWES, J., and SULLIVAN, J.

MEMORANDUM BY BOWES, J.:                    **FILED AUGUST 31, 2023**

Zaryab Iqbal ("Mother") appeals from the custody order entered on March 22, 2023,[1] awarding shared physical custody between Mother and Christopher J. Zorn ("Father").  We affirm.

We glean the following from the certified record.  Mother and Father were married in 2005 and divorced in 2016.  Their only child, E.I.Z., was born in July 2009.  By agreement of the parties, they have shared physical custody and alternated periods where Mother or Father had primary custody.  Of relevance, the custody order was modified by agreement in 2018, giving Father primary physical custody during Mother's employment at the National

_____

[1]  Although the order was filed on March 21, 2023, the clerk did not note the entry of the order until March 22, 2023.  The Rules of Civil Procedure provide that an order shall be considered entered on "the day on which the clerk makes the notation in the docket that notice of entry of the order has been given as required by Pa.R.Civ.P. 236(b)."  Pa.R.A.P. 108(b).  Thus, we use March 22, 2023 as the pertinent date for the order appealed from.

Science Foundation, which required her to relocate during the week. The new terms were to end upon termination of her employment, or July 1, 2020, whichever was earlier.

In January 2020, prior to expiration of the modified terms, Mother filed a petition to modify custody to award her primary physical custody. Father filed a counter-petition seeking, *inter alia*, shared physical custody. Following a hearing, the court entered an order awarding Mother primary physical custody. The court set forth in a separate order a parenting plan detailing Father's periods of partial custody. ***See*** Trial Court Opinion and Order, 6/11/20.

As borne out by the record and aptly stated by the trial court, Mother and Father "have incessantly and inappropriately quarreled with one another throughout the course of their divorce and ongoing custody disputes" and "continue to maintain a highly contentious relationship with one another with little to no regard for how their actions may impact the mental and emotional wellbeing of their [m]inor [c]hild." Trial Court Opinion and Order, 3/22/23, at 1-2. With that backdrop, the court summarized the ensuing procedural history that led to the instant appeal.

> The present dispute seems to arise in part from a cease-and-desist letter sent by Father's attorney to Mother's attorney and carbon-copied and sent to a number of area police agencies[, alleging, among other things, that Mother had been harassing and stalking Father]. After receiving this letter, Mother unilaterally decided to deviate from the existing custody order and demand that all custody exchanges take place either at her residence or in

a public place.  Shortly thereafter, Mother filed a petition to modify custody on April 14, 2022.

*Id*. at 2 (cleaned up).

Father responded with a counter-petition to modify custody.  He also filed both a petition for contempt and supplemental petition for contempt based upon Mother's refusal to transport E.I.Z. to Father's home pursuant to the existing custody order, as well as intentionally violating that order's no-conflict provision.  The court scheduled a hearing, which was continued pending possible agreement of the parties.  Negotiations failed, however, and the court scheduled a joint custody and contempt hearing on March 14, 2023.  The court first interviewed then-thirteen-year-old E.I.Z. *in camera*, and afterwards heard testimony from Mother, Father, and Mother's friend, Felisa Higgins.

> At the hearing on March 14, 2023, Mother indicated that she no longer wishe[d] to modify the existing custody order, except that she wishe[d] for all custody exchanges to occur at either her residence or Tudek Park in State College.  In contrast, Father still [sought] primary custody of the minor child or, alternatively, to have a 50/50 custody split with each party alternating weeks of physical custody.

*Id*. at 2-3 (cleaned up).

Thereafter, the trial court entered the instant custody order, granting in part and denying in part both Mother's petition and Father's counter-petition

to modify custody.[2] In doing so, the court issued a separate order and parenting plan providing that the parents jointly share legal and physical custody of E.I.Z. and setting in place a weekly alternating schedule of custody every seven-days. The exchanges were set to take place on Fridays in the parking lot of Tudek Park.

In accordance with the rules pertaining to children's fast track appeals, Mother simultaneously filed the instant, timely notice of appeal and concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i). The trial court directed us to the March 22, 2023 custody order for its reasoning. *See* Pa.R.A.P. 1925(a)(2)(ii). Mother presents a single issue for our consideration:

> Did the trial court abuse its discretion and fail to consider the best interests of the child by issuing a physical custody schedule that alternates weeks of custody during the school year when Mother had previously been the primary caretaker since June 11, 2020, the child expressed a strong preference to remain with [M]other, and there have been no significant changes to the [c]hild's life since June 11, 2020?

Mother's brief at 5.

We begin with our standard of review:

_____

[2] This order also granted Father's contempt petitions based upon Mother's violation of the prior custody order's no-conflict provision. Mother does not challenge this portion of the order on appeal. As it sheds light on the court's custody decision to minimize interactions between Mother and Father, as well as its conclusion that Mother contributes more to the conflict, we observe that in finding Mother in contempt, the court noted its concern that Mother not only "disparage[d] Father in front of [E.I.Z.], but [furthermore] sought to include the child in caustic and hostile communications to which he was not originally and should never have been privy to." Opinion and Order, 3/22/23, at 10.

In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion. We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

*White v. Malecki*, ___ A.3d ___, 2023 PA Super 102, 2023 WL 3910443, at *2 (June 9, 2023). The Child Custody Act provides that, "[i]n ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child[.]" 23 Pa.C.S. § 5328(a). Section 5328(a) sets forth a non-exhaustive list of those factors:

(1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

(2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

(2.1) The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

*Id*.

According to Mother, the trial court did not give factor seven, the preferences of the child, adequate consideration. **See** Mother's brief at 11 (cleaned up). Specifically, she assails at length the court's scrutiny of the

child's age, maturity, intelligence, and reasons for his preference. *Id*. at 11-21. Additionally, she notes that the trial court modified custody despite finding more factors in favor of Mother. *Id*. at 22. She espouses that there is no support in the record for the court's finding that the parents' quarrelsome behavior has emotionally harmed E.I.Z. and disagrees with the court's conclusion that Mother contributes more to the conflict. *Id*. at 25-28, 31. Finally, she posits that custody modification was inappropriate and unwarranted in light of the minimal change in circumstances regarding E.I.Z. from the 2020 Custody Order to the 2023 Custody Order. *Id*. at 28. In sum, Mother asks this Court to "reject the conclusion of the trial court as . . . unreasonable[,]" arguing particularly that the trial court "failed to give the required w[eigh]t to the child's preference." *Id*. at 32, 34 (cleaned up).

Our Court has outlined the weighing of a child's preference as follows:

> Although the express wishes of a child are not controlling in custody decisions, such wishes do constitute an important factor that must be carefully considered in determining the child's best interest. The weight to be attributed to a child's testimony can best be determined by the judge before whom the child appears. The child's preference must be based upon good reasons and his or her maturity and intelligence must also be considered.

*D.R.L. v. K.L.C.*, 216 A.3d 276, 285 (Pa.Super. 2019) (cleaned up).

Here, the trial court presented the following analysis with respect to its consideration of E.I.Z.'s preference regarding custody:

> [E.I.Z.] expressed a strong preference to remain with Mother during the week due to her providing more consistent reminders to complete his assignments, but to have the weekends with Father due to Father being more supportive of [his]

recreational and extracurricular activities. [E.I.Z.] further expressed that he loves his time with both parents.

The court finds this factor to favor Mother; however, while [E.I.Z.] is clearly very intelligent, the court also finds from [his] answers to certain questions that he may not be emotionally mature enough at this stage to separate his well-reasoned preferences from his emotional reactions to his parents having romantic relationships with their respective paramours.

Trial Court Opinion and Order, 3/22/23, at 5-6 (cleaned up).

Upon review, the certified record supports the court's conclusions and weighing of the various custody factors. As to factor seven, the court was in the best position to determine the weight to give to E.I.Z.'s preferences and we will not re-weigh those wishes or view them through Mother's prism. The court unquestionably considered E.I.Z.'s maturity, age, intelligence, and the reasons for his stated preference. The court's assessment that E.I.Z.'s preferences were clouded, in part, by his discomfort with Father having a romantic partner was borne out by his testimony regarding Father's girlfriend of four years, whom he referred to as a "drain monetary[il]y" and "timewise[,]" is "there all the time[,]" and to whom Father "kind of caters[.]" N.T. Hearing, 3/14/23, at 28, 30; *see also id*. at 28 (admitting that he does not "like the prospect really that much of either of [his] parents having a significant other" and complaining that when he is with Mother, Father does things with his partner that E.I.Z. would have enjoyed); *id*. at 29-31 (expressing frustration that Father will not spend money on some of E.I.Z.'s hobbies but will drive to his girlfriend's home and go out to restaurants with

her, and that E.I.Z. is unable to informally spend extra time with Father because he has pre-existing plans with his girlfriend).

Moreover, it is apparent from the record that the court fashioned the modified custody order with the best interests of E.I.Z. at the forefront. Both parents established through testimony and past periods of primary custody their ability to ably parent E.I.Z. and attend to his educational, recreational, social, and spiritual needs. At the same time, however, the contentious relationship between Mother and Father is palpable. The court's decision to minimize mid-week interactions and lessen the overall number of exchanges during the year by employing a fifty-fifty alternating-week schedule is a reasonable attempt to mitigate interactions between the parents and the apparent stress placed upon E.I.Z., both in terms of being put in the middle of those feuds and in having to move his many belongings. Indeed, while this custody schedule was not the one advocated for by E.I.Z., it was designed to alleviate the concerns he voiced regarding the impact of his parents' quarrels on him and his dislike of mid-week custody exchanges. *See id*. at 23-27.

In short, we discern no abuse of discretion on the part of the trial court in modifying custody so that both parents have an equal opportunity to be part of E.I.Z.'s academic, recreational, social, and spiritual life while minimizing the number of exchanges and, hopefully, conflict between Mother and Father in the presence of E.I.Z. As we deem the trial court's custody determination to be reasonable in light of the evidence of record, we will not

disturb it.  **See White**, **supra** at *2 ("Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record.").

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 08/31/2023